# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 01-1896
No. 01-1901

_____

Donald W. Stearns, on behalf of     *
himself and all others similarly situated, *
                              *

      Plaintiffs - Appellees/       *
      Cross Appellants,         *

                              *    Appeals from the United States
  v.                           *    District Court for the
                              *    District of Minnesota.

NCR Corporation, et al.,        *
                              *

      Defendants - Appellants/    *
      Cross Appellees.         *

_____

Submitted: February 13, 2002

Filed: July 22, 2002

_____

Before LOKEN, FAGG, and RILEY, Circuit Judges.

_____

LOKEN, Circuit Judge.

In late 1998, when NCR Corporation announced that it would reduce retirees' health care benefits, Donald W. Stearns commenced this class action on behalf of former salaried employees who had participated in an early retirement program offered by NCR in the fall of 1993. Following certification of the class, the parties filed cross motions for summary judgment. Plaintiffs asserted that the more generous

benefits offered as part of the 1993 early retirement program are vested and unalterable. NCR argued that it reserved the right to modify these benefits in the relevant plan documents. The district court rejected plaintiffs' claims under the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001 *et seq.*, but granted the class members summary judgment on their claims that NCR breached a separate early retirement contract. Stearns v. NCR Corp., 97 F. Supp. 2d 954 (D. Minn. 2000). NCR appeals, and plaintiffs cross-appeal the district court's denial of their ERISA claims. We review these summary judgment rulings de novo, using the same standard as the district court. Concluding that plaintiffs are not entitled to relief under either theory, we affirm in part and reverse in part.

## I. Background.

NCR offered the 1993 Enhanced Retirement Program (the "Program") to salaried employees who were at least fifty years old and had worked for NCR for at least ten years. In exchange for retiring effective January 1, 1994, eligible employees were offered a collage of financial benefits, including a $30,000 lump sum payment added to their 1993 salaries, paid vacation time in 1994, pension benefits calculated without a reduction for early retirement, enhanced life insurance coverage, and the benefit at issue in this lawsuit -- eligibility for more favorable retirement health care benefits than were available under NCR's existing retirement health care plans.[1]

---

[1]Participants who retired at ages 50-54 would receive NCR's existing "Choice 2 (80/20) Health Care Plan," whereas no retirement health care benefits were previously available to this age group. In addition, all participants retiring before age 65 would receive NCR's Mail Order Prescription Drug Program, previously available only to active employees. Finally, NCR made a "permanent" plan change whereby those not electing to participate who later retired at ages 55-64 would receive Choice 2 (80/20) Health Care coverage, instead of the more generous "OPTION 1 (90/10) Health Care" coverage previously provided.

When the Program was offered, existing health care benefits for NCR's salaried employees and retirees were defined in a comprehensive document entitled Group Benefits Plan For Salaried Employees Effective January 1, 1993 (hereinafter, the "Group Benefits Plan"). This document was an "employee welfare benefit plan" for purposes of ERISA. See 29 U.S.C. § 1002(1). Part VII of this plan explained the benefits available to retired employees and their spouses. Part I, entitled General Provisions, included Section 12, entitled Other Important Facts, which included the following provision:

> F. PLAN AMENDMENT. The Company reserves all rights at any time or from time to time to amend the Plan in whole or in part . . . . The Company reserves the right to change or cancel the Plan, or any benefits under the Plan, at any time. If the Company cancels the Plan or any benefits under the Plan, participation in the cancelled benefits would end on the date of cancellation.

We will refer to this as the Reservation of Rights provision. It is the principal basis for NCR's contention that the retirement health care benefits at issue are not vested.

After announcing the Program, NCR distributed a Questions and Answers Guide "to provide [eligible employees] with information to assist them as they make decisions relative to the Enhanced Retirement Program." Part IV of this Guide, entitled Post Retirement Health Care Benefits, advised prospective participants to "refer to our 'Group Benefits Plan' booklet which was mailed to your home earlier this year for the details of the NCR Health Care Plans." In addition, NCR described the retirement health care benefits as subject to modification at seminars and broadcasts conducted to explain the Program to prospective participants.

To participate in the Program, an eligible employee had to sign a form entitled Election To Volunteer for the Enhanced Retirement Program and Release of Claims no later than December 17, 1993. This form provided in relevant part:

> After considering my personal situation, I elect to retire under the terms of the Enhanced Retirement Program. I have reviewed and understand the terms of the Program and this Election Form. I understand that by retiring under the Enhanced Retirement Program I am entitled to a package of benefits that exceeds the benefits that I would normally receive. In exchange for these additional benefits, I acknowledge and agree to the following:
>
>      *    *    *    *    *
>
> 5. I release and discharge NCR . . . [from] all claims I have, have ever had, or may now have, for or related in any way to my employment or the end of my employment with NCR . . . . This release does not affect my rights to benefits due under the Enhanced Retirement Program.

Like the district court, we will refer to these forms as the Releases.

After January 1, 1994, when Program participants retired and began receiving retirement benefits, NCR made a number of relatively modest changes to their health care benefits without objection. This dispute arose when NCR notified the Program's early retirees that significant adverse changes would be made to their retirement health care benefits effective January 1, 1999. These changes included a new percentage-of-premiums charge, increased deductibles and co-payments, and elimination of NCR's Medicare supplement plan for retirees over the age of 64. Stearns commenced this action on November 4, 1998, alleging that these changes were unlawful because the class members' retirement health care benefits became vested by virtue of their participation in the Program. As relevant to this appeal, Stearns asserted claims for breach of contract and for enforcement of ERISA plan terms under 29 U.S.C. § 1132(a)(1)(B), the ERISA provision authorizing a plan participant to sue "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."

-4-

## II. The District Court's Breach of Contract Ruling.

In ruling on the cross motions for summary judgment, the district court first rejected plaintiffs' ERISA plan enforcement claim, concluding that the Program was an amendment to the Group Benefits Plan, not a separate free-standing ERISA plan, and that the Reservation of Rights provision in the Group Benefits Plan applies to NCR retirees "in general." 97 F. Supp. 2d at 961. However, the court then ruled in plaintiffs's favor on their breach of contract claims, concluding that the Releases signed by Program participants formed "independent bilateral contracts" with NCR that must be construed "according to basic principles of contract interpretation." As the Releases failed to reserve expressly the unilateral right to amend or cancel the Program's retirement health care benefits, and did not unambiguously refer to another document containing such a reservation of rights, the Releases must be construed against the party that drafted them, NCR, as impliedly promising vested retirement health care benefits. 97 F. Supp. 2d 961-67.

In our view, by resolving the ERISA claims before analyzing the breach-of-contract issues, the district court put the cart before the horse. Without question, there was a bilateral contract between NCR and each Program participant defining the terms upon which those parties agreed to terminate their employment relationship. The district court mistakenly treated the Releases themselves as the bilateral contracts. They were only part of the contracts, the part signifying an employee's acceptance of NCR's offer of enhanced early retirement benefits. The Releases contained some contract terms, but most of the terms were set forth in the documents which offered the Program to eligible employees. Those documents and the Releases collectively formed the bilateral contracts. However, the critical error in the district court's breach-of-contract analysis was more fundamental than simply misconstruing the nature of the bilateral contracts.

In general, an employment contract between an employer and a non-union employee is governed by state law, not by ERISA or by the federal labor laws. However, to the extent an employment contract provides pension or welfare benefits through a plan or program covered by ERISA, that statute and its remedial provisions completely preempt state law remedies for breach of contract. See, e.g., Lyons v. Philip Morris, Inc., 225 F.3d 909, 912-13 (8th Cir. 2000). Thus, in dealing with a multi-faceted employment contract such as NCR's early retirement Program, some facets may be governed by ERISA (such as the Program's promise of enhanced pension benefits), while others may be governed by state law (such as NCR's promises to pay $30,000 in additional salary in 1993 and vacation pay in 1994). If a facet is governed by ERISA, any dispute over the terms *of that benefit* must be resolved by looking to ERISA's statutory provisions and relevant case law. Claims for ERISA benefits are determined by construing the plan in toto, not a single document such as the Releases in isolation. To be sure, "basic principles of contract interpretation" are often relevant in construing an ERISA plan. But if the plan, properly construed, does not afford the benefits at issue, they may not be added to the plan by implication from an "independent bilateral contract."

In this case, we are concerned with enhanced retirement health care benefits. All parties agree that this facet of the Program is an employee welfare benefit plan. Therefore, plaintiffs' claim that those benefits were vested is governed by ERISA. The claim is of course contractual in nature, but the district court erred in looking beyond ERISA plan interpretation principles by splitting plaintiffs' single ERISA claim into distinct ERISA and breach-of-contract components.[2]

---

[2]The district court's bilateral contract analysis relied on dicta in Frahm v. Equitable Life Assurance Soc'y of the U.S., 137 F.3d 955, 957-58 (7th Cir.), cert. denied, 525 U.S. 817 (1998), suggesting "that bilateral contracts about welfare benefits are possible." But Judge Easterbrook's opinion in Frahm did not suggest that benefits disputes arising out of bilateral contracts that establish or amend an ERISA plan would *not* be governed by ERISA plan interpretation principles.

### III.  The ERISA Claim.

The issue in this case is whether the Program's retirement health care benefits were vested when plaintiffs agreed to participate in the Program.  ERISA mandates vested pension benefits.  See 29 U.S.C. § 1053.  But Congress did not mandate vesting for employee welfare benefit plans, such as health care plans.  See 29 U.S.C. § 1051(1); Curtiss-Wright Corp. v. Schoonejongen, 514 U.S. 73, 78 (1995).  "Therefore, an employer may unilaterally modify or terminate medical benefits at any time absent the employer's contractual agreement to the contrary."  Jensen v. SIPCO, Inc., 38 F.3d 945, 949 (8th Cir. 1994) (quotation omitted), cert. denied, 514 U.S. 1050 (1995).  Plaintiffs have the burden of proof on the vesting issue.  See Hutchins v. Champion Int'l Corp., 110 F.3d 1341, 1345 (8th Cir. 1997).

1.  A critical threshold issue is to define the contours of the ERISA plan we are construing.  NCR argues that the Program's retirement health care benefits were provided as an amendment to NCR's existing Group Benefits Plan, which contained the Reservation of Rights provision.  Plaintiffs argue that the Program constituted an independent ERISA plan, separate from the broader Group Benefits Plan and its Reservation of Rights provision, and therefore the relevant plan contains no express reservation of NCR's right to modify or terminate the plan's retirement health care benefits.  The district court rejected plaintiffs' contention, concluding that "[t]he documentary evidence offered by the parties in this case makes clear that the . . . Program is not, as plaintiffs contend, a free-standing ERISA plan.  Rather, NCR amended the basic health care plan that it provided for its employees at the time of the . . . Program's inception."  97 F. Supp. 2d at 957.

After careful review of the documentary record, we agree with the district court's thorough analysis of this issue.  The documents NCR distributed in offering the Program were not sufficient to explain the retirement health care benefits being offered without reference to the detailed benefit provisions in the existing Group

Benefits Plan. Indeed, NCR's Question and Answer Guide -- a document plaintiffs cite as strong evidence the Program was a free-standing ERISA plan -- advised employees to "refer to our Group Benefits Plan booklet . . . for the details of the NCR Health Care Plans." In addition, the documents by which NCR formally adopted the Program confirm that it was an amendment to existing employee benefit plans.

2. Concluding that the Program's retirement health care benefits were an amendment to the Group Benefits Plan means that the relevant plan documents included the express Reservation of Rights provision. That is very significant, because "a reservation-of-rights provision is inconsistent with, and in most cases would defeat, a claim of vested benefits." Jensen, 38 F.3d at 950. We have repeatedly held that an unambiguous reservation-of-rights provision is sufficient without more to defeat a claim that retirement welfare plan benefits are vested. See Hughes v. 3M Retiree Medical Plan, 281 F.3d 786, 792-93 (8th Cir. 2002) (reservation of rights provision in plan "devoid of vesting language" defeats vesting claim); United Paperworkers Int'l Union v. Jefferson Smurfit Corp., 961 F.2d 1384, 1385 (8th Cir. 1992) (unambiguous reservation of rights clause and "absolutely nothing in the plan to contradict or cloud [its] plain and obvious meaning" defeats vesting claim); Anderson v. Alpha Portland Indus., Inc. 836 F.2d 1512, 1514, 1519 (8th Cir. 1988) (plan provision that retirement health benefits "may now or hereinafter be amended, modified or supplemented in collective bargaining" inconsistent with vesting), cert. denied, 489 U.S. 1051 (1989).

If a reservation-of-rights provision is facially ambiguous, or if it conflicts with other plan provisions, the court in resolving a dispute over vesting may look at extrinsic evidence to determine whether the parties intended to confer vested retirement health care benefits. See Barker v. Ceridian Corp., 122 F.3d 628, 635-39 (8th Cir. 1997); Jensen, 38 F.3d at 950-52. But there must be an affirmative indication of vesting in the plan documents to overcome an unambiguous reservation of rights. See Hutchins, 110 F.3d at 1345-46 (when plan authorizes employer to

terminate or modify it, benefits are not vested "[i]n the absence of contrary language in the plan"). An intent to vest may not be implied from the fact that the Releases and the NCR documents explaining the Program did not address the vesting issue or cross-reference the Reservation of Rights provision. Indeed, not even the ERISA-mandated summary plan description need disclose that welfare plan benefits are not vested. See Hughes, 281 F.3d at 792; Jensen, 38 F.3d at 952. Thus, under our well-established principles of ERISA plan interpretation,[3] the district court properly granted summary judgment in favor of NCR dismissing plaintiffs' ERISA plan enforcement claims. Because plaintiffs have no separate breach-of-contract claims, this ends the case.

The judgment of the district court is reversed. The case is remanded with directions to dismiss plaintiffs' complaint with prejudice and to disburse the Escrow Funds to NCR in accordance with paragraph 3 of the district court's Order Staying Judgment Pending Appeal dated March 13, 2001. Plaintiffs' motion to strike portions of NCR's brief is denied as moot.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.

---

[3]Other circuits similarly require clear expressions of an intent to vest welfare plan benefits and enforce unambiguous reservation-of-rights provisions. See Int'l Union, UAW v. Skinner Engine Co., 188 F.3d 130, 139 (3rd Cir. 1999); Joyce v. Curtiss-Wright Corp., 171 F.3d 130, 135-36 (2d Cir. 1999); Sprague v. General Motors Corp., 133 F.3d 388, 400 (6th Cir.) (en banc), cert. denied, 524 U.S. 923 (1998); Wise v. El Paso Natural Gas Co., 986 F.2d 929, 937 (5th Cir.), cert. denied, 510 U.S. 870 (1993).